M. LASDEN, INC. *vs.* DECKER ELECTRICAL CORPORATION & others.[1]

Suffolk.    January 5, 1977. — March 16, 1977.

Present: QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Bond,* Private building project.

Materials sold to a subcontractor with the reasonable and good faith expectation that they would be used in the construction of a project covered by a surety bond were "used or reasonably required for use in the performance of the contract," as required by the bond, even though the materials were not actually used in construction or did not meet contractual specifications. [183-185]

BILL IN EQUITY filed in the Superior Court on June 28, 1974.

The suit was heard by *Hallisey,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Francis G. Ermilio* for United States Fidelity and Guaranty Company of Baltimore, Maryland.

---

[1] United States Fidelity and Guaranty Company of Baltimore, Maryland, and Seppala & Aho Construction Co., Inc.

*Franklin S. Prizer* (*Barry R. Weener* with him) for the plaintiff.

LIACOS, J.   This is an appeal from a judgment of the Superior Court allowing the plaintiff recovery on a surety bond issued by the defendant surety, the appellant here. The sole issue on appeal is whether materials sold by the plaintiff to Decker Electrical Corporation (Decker) with the reasonable and good faith expectation that they would be used in the construction of a project covered by the bond were "used or reasonably required for use in the performance of the Contract," as required by the surety bond on which recovery is sought.

On July 2, 1973, Seppala & Aho Construction Co., Inc. (S & A), a general contractor, entered into an agreement to construct what is now known as the Walpole Shopping Mall (mall). In compliance with the terms and conditions of the contract, S & A, as principal, obtained a surety bond from the United States Fidelity and Guaranty Company, protecting claimants who had "a direct contract with the Principal or with a sub-contractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract . . . ."

Decker was awarded the subcontract to do the electrical work on the project. The plaintiff, whose place of business was located in Canton, 2.7 miles from the Walpole construction site, opened a running account with Decker to supply it with electrical supplies for use at the mall job site. The trial judge found that the materials purchased by Decker "were ordinarily used in the construction of buildings like those at the Mall" and were shipped by the plaintiff to the site "at a stage [of construction] where such electrical equipment would normally be required." The judge also found that while Decker's contract with S & A contained specifications for the materials used the plaintiff "was unaware of the specifications."

At the time it accepted this job, Decker was subcontractor at other job sites as well as at the mall. In addition, it apparently maintained a supply depot in Nashua, New

Hampshire. At the inception of the contract, Decker used a system whereby orders from the plaintiff for the mall were designated "Job No. 1071" and those for the Nashua supply depot as either "7000" or "SHOP." While the plaintiff knew of these designations, it was not informed that the system was abandoned in mid-1973 and that thereafter all orders for the mall, as well as other job sites or the Nashua depot, were ordered by Decker under "1071."[2]

In all probability, the controversy in this case would not have arisen but for the fact that Decker was adjudicated bankrupt in December, 1975. As of January 1, 1974, Decker owed the plaintiff a substantial sum for supplies delivered, and the plaintiff had made a demand for payment in April, 1974, on Decker, S & A and the defendant surety. When no further relief was forthcoming, the plaintiff filed suit against the three above named parties. The judge allowed recovery against the surety on the bond on the theory that any materials shipped by the plaintiff to the mall job site with the reasonable expectation that they would be used in the construction of the mall would satisfy the condition of the bond covering materials "used or reasonably required for use in the performance of the Contract."[3]

It is important to note what issues are not before the court on this appeal. First, the surety has not asserted any argument that the plaintiff is not a proper claimant within the terms of the bond. See *Graybar Elec. Co.* v. *St. Paul Fire & Marine Ins. Co.*, 195 So. 2d 82 (Miss. 1967); *O'Neal Steel Co.* v. *Leon C. Miles, Inc.*, 187 So. 2d 19 (Miss. 1966). Nor has the surety adequately raised the

---

[2] The judge specifically disallowed recovery on certain invoices which he found could not have been intended by the plaintiff for use in the mall. No appeal was taken from that ruling by the plaintiff.

[3] The judge ordered the entry of judgment for the plaintiff against Decker in the amount of $7,074.44 and as against United States Fidelity & Guaranty Co. of Baltimore, Maryland, in the amount of $5,383.49. The difference between the two entries was based on certain "deductions" for tools not covered by the bond and for materials not intended by the plaintiff for the mall. The judge found no privity of contract between the plaintiff and S & A and ordered entry of judgment for that defendant.

issue as to whether it can be held liable in the absence of a finding of liability of the principal.[4] Thus, the sole issue is whether the materials shipped by the plaintiff fell within the terms of the bond's coverage.

The surety advocates a strict interpretation of the condition at issue in this case. It would limit the coverage of the bond to the materials either actually used in construction or those materials meeting the contractual specifications purchased by Decker with the reasonable possibility that they would be so used. The plaintiff, on the other hand, focuses on the claimant's intent in furnishing the material and argues that if the materials were sold to Decker in the good faith and reasonable belief that they were to be used in the construction of the mall that is sufficient to allow recovery against the surety whether they were actually used therein or not.

We begin by noting that the bond provision at issue in this case contains language which tracks exactly language contained in G. L. c. 149, § 29A. The purpose of § 29A was to create a statutory exception to the rule of law in this Commonwealth which had been held to preclude recovery under a contract by a third-party beneficiary. *Mellen* v. *Whipple*, 1 Gray 317 (1854). See Bernhard, Third Party Beneficiary Rights in Massachusetts, 49 Mass. L.Q. 159 (1964). In creating such an exception, the statute must be seen to incorporate certain policies relative to the protection of materialmen. The bond, being contingent for enforceability on the statute, must be interpreted in accord with those policies. Compare *Waite Hardware Co.* v. *Ardini & Pfau, Inc.*, 339 Mass. 634 (1959), with *Nash* v. *Commonwealth*, 174 Mass. 335 (1899).

We believe that these policies can be ascertained from

---

[4] The surety arguably attempted to raise the issue through the inclusion of two short sentences in its brief. However, this does not suffice to raise the issue under our practice. *Moskow* v. *Boston Redevelopment Auth.*, 349 Mass. 553, 568 (1965), cert. denied, 382 U.S. 983 (1966). *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 430 (1965). Statements at oral argument by the appellant's counsel confirm that this issue was not being raised by the appellant.

our cases concerning the counterpart to § 29A which governs public sector contracts, G. L. c. 149, § 29. We have said that the purpose of that latter statute is to afford security to subcontractors in their dealings in such matters. See, e.g., *Lawrence Plate & Window Glass Co.* v. *Varrasso Bros.*, 353 Mass. 631, 633 (1968). Since the statutory purpose is remedial in nature, it should be broadly construed to effectuate its self-evident policies. *American Air Filter Co.* v. *Innamorati Bros.*, 358 Mass. 146, 150 (1970). *Warren Bros. Rds. Co.* v. *Joseph Rugo, Inc.*, 355 Mass. 382 (1969).

While we have held that § 29 requires actual use of the materials in the construction of the project, *Walsh Holyoke Steam Boiler Works, Inc.* v. *McCue*, 289 Mass. 291, 294 (1935), that decision reflected the specific words in § 29 which allow protection for the materialmen when the materials are "used or employed" in the construction of the public work involved. Thus, while both § 29 and § 29A have similar policy purposes behind them, the crucial language differs in that § 29A has no such requirement, providing, rather, protection for the supplier as to "material used or reasonably required for use in the performance of the contract . . . ." While we intimate no opinion here on the continuing vitality of the interpretation of § 29 found in *McCue*, we note that the particular statutory language utilized in this regard may be determinative of the scope of protection afforded.

The Federal counterpart to § 29, the Miller Act, 40 U.S.C. § 270a (1970), requires a bond "for the protection of all persons supplying labor and material in the prosecution of the work . . . ." This Federal statute has been almost uniformly interpreted to cover materials supplied with the good faith intent that they were to be incorporated into the covered project but which were not actually so incorporated. See generally Annot., 79 A.L.R.2d 843, 846-849 & n.13. Furthermore, under State statutes regulating mechanics' liens, many jurisdictions have held that actual use is not required to sustain the lien but that delivery to a building site for that purpose will be sufficient. See

generally Annot., 39 A.L.R.2d 394, 399-418.[5] Indeed, we have held recently as to § 29 that a subcontractor's failure to install materials delivered by a supplier with the intent that they should be incorporated into a project does not defeat a statement of claim filed by the supplier within the time allowed after the date of delivery. *International Heating & Air Conditioning Corp.* v. *Rich Constr. Co., ante,* 134 (1977). That decision ultimately rests on the rationale that "it would be anomalous if the subsequent failure of the subcontractor to install them were retroactively to render the supplier's claim untimely."

It would be similarly anomalous if a claimant falling within the protected class of the bond could have its protection nullified by the actions of the subcontractor which were not known or could not reasonably have been known by the claimant.[6] To allow recovery on the facts of this case gives effect to the relevant language of § 29A. Cf. *Aetna Ins. Co.* v. *Maryland Cast Stone Co.,* 254 Md. 109 (1969). Such a result is also supported by policy reasons and common sense. If the position of the surety were adopted, a supplier would be forced, at minimum, to ascertain the existence and content of contractual specifications known initially only to the contractor or could possibly require that the materialman ensure that the materials

---

[5] See, e.g., *Idaho Lumber & Hardware Co.* v. *DiGiacomo,* 61 Idaho 383, 386 (1940), where the relevant statute covered materials "*to be used* in the construction . . . [of any building]." The court held that delivery was sufficient to sustain the lien. But cf. *Bennett* v. *Beadle,* 142 Cal. 239 (1904). The Massachusetts mechanics' lien statute, G. L. c. 254, §§ 2, 3, covers material furnished "*by virtue of said contract*" and "under a contract." Whether delivery alone will sustain the lien has not been decided since the statute was enacted in its present form in St. 1915, c. 292, §§ 2, 3, and amended by St. 1916, c. 306, §§ 1, 2. For the previous law requiring actual use see *Whitford* v. *Newell,* 2 Allen 424 (1861). See generally *International Heating & Air Conditioning Corp.* v. *Rich Constr. Co., ante,* 134 (1977).

[6] We think the judge correctly stated the relevant principle in his memorandum of decision: "It would be unreasonable to burden a materialman with the obligation of seeking out the specifications, examining the building, doubtless with the assistance of an expert, to be certain that the parts being ordered met the specifications and were required in the building at its then stage of construction."

supplied were actually incorporated into the project. This would be a burden foreign to what we understand to be business practice.[7] Such a view does not accord sufficient protection to materialmen as the statute would seem to require. To adopt this practice might very well discourage the sale of materials to such projects.

For these reasons, we affirm the judgment of the Superior Court.

*So ordered.*

---

[7] Our conclusion relative to the inappropriateness of the duty of such inquiry is supported by St. 1972, c. 399, amending G. L. c. 149, § 29A, which eliminated a requirement of reliance on the existence of the bond by the materialmen as a precondition to recovery.